1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DONTAY D. HAYES,
CDCR #K-88757,

                                                Plaintiff,

              vs.

JOHN DOVEY; JEANNE WOODFORD;
J.G. GIURBINO; M.E. BOURLAND;
G.J. JANDA; WENDY STILL;
JAMES TILTON,

                                              Defendants.

Civil No.    09cv1016 BTM (RBB)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT PURSUANT
TO Fed.R.Civ.P. 56(c)**

**(ECF No. 79)**

**I.      Procedural Background**

        Dontay Hayes ("Plaintiff"), a state prisoner incarcerated at Calipatria State Prison

("CAL"), is proceeding pro se and *in forma pauperis* in this civil rights action filed pursuant

to 42 U.S.C. § 1983.

        Plaintiff claims J. G. Giurbino, M.E. Bourland, and G.J. Janda, CAL's former Warden,

Chief Deputy Warden, and Associate Warden, respectively, deprived him of outdoor exercise

for approximately nine months in violation of the Eighth Amendment while the institution was

on lockdown from August 2005 through May 2006 (ECF No. 42).[1]

_____

        [1] All other claims previously alleged against additional parties have been dismissed. *See* April
22, 2010 Order (ECF No. 39) (dismissing Defendants Dovey, Still, and Woodford); March 28, 2011
Order (ECF No. 57) (dismissing Defendant Tilton), and December 8, 2011 Order (ECF No. 75)

1  Bourland, Janda and Giurbino ("Defendants") now seek summary judgment pursuant to

2  FED.R.CIV.P. 56 (ECF No. 76).  Defendants and the Court have provided Plaintiff with notice

3  of the requirements for opposing summary judgment pursuant to *Klingele v. Eikenberry*, 849

4  F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) (ECF

5  Nos. 79-2, 80).  Plaintiff has since filed a Response in Opposition (ECF No. 84), Declarations

6  in Support of his Opposition (ECF No. 85),  a Separate Statement of Undisputed Facts (ECF

7  No. 88), and a Supplemental Opposition (ECF No. 97).  Defendants have filed a Reply (ECF

8  No. 90) as well as a Notice alerting the Court of an unpublished Ninth Circuit's opinion in

9  *Franklin v. Scribner*, 07cv0438 WVG (RBB), a case involving similar Eighth Amendment

10  claims raised by another prisoner related to the same lockdown at issue in this case (ECF No.

11  94).

12  While this case was randomly referred to the Honorable Ruben B. Brooks pursuant to

13  28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation

14  regarding the disposition of Defendants' Motion, nor oral argument is necessary.  *See* S.D.CAL.

15  CIVLR 72.3(a); S.D. CAL. CIVLR 7.1.d.

16  Having carefully considered the record as submitted, the Court now GRANTS

17  Defendants' Motion for Summary Judgment because it finds they are entitled to judgment as

18  a matter of law pursuant to FED.R.CIV.P. 56(a).

19  **II.   Factual Background**

20  **A.    Undisputed Facts**

21  During the entire period which is the subject of his suit, Plaintiff was assigned to CAL's

22  Facility A.  *See* Pl.'s Decl. in Supp. of Opp'n (ECF No. 85) at 1 ¶ 2; Borg Decl. Ex. A (ECF No.

23  79-5) at 13.

24  On August 18, 2005, a "riot against staff" broke out in three separate sections of Facility

25  C between Hispanic inmates and prison officials.  *See* Builteman Decl. (ECF No. 79-10), Ex.

26  A [CDC 837-A "Amended Crime/ Incident Report" Log No. CAL-FCY-05-08-0455 at 5-11].

27  ———————————————

28  (dismissing Defendant Woodford).

The incident began at 2:55 p.m. in the Facility C Gym area when Correctional Officer Harbert discovered what he believed to be a weapon while conducting a clothed body search of an inmate named Gracia. *Id.* at 6. Harbert ordered the yard down, but Gracia began to struggle, and he struck Harbert in on the right side of the head. Approximately 10 to 20 Hispanic inmates then ran towards Officer Harbert and "began battering him, kicking and beating him with their hands and feet." *Id.* When another officer named Mosely saw Gracia strike Harbert, he began to assist, but was chased by 4 Hispanic inmates, one of whom he observed carrying an inmate-manufactured weapon. *Id.* Mosely retreated, but drew his state-issued expandable baton and struck the inmate who possessed the weapon. *Id.* When Officer Manning also attempted to assist, he too was chased by 4 Hispanic inmates, one of whom was also "brandishing a weapon." *Id.* Officer Manning was forced to retreat to a basketball court for his own safety, but Officer Harbert "received numerous injuries to his head and upper torso, was transported to Pioneer's Memorial Hospital and received "40 plus" stitches to his head. Officer Mosely also sustained injuries to his head, neck and torso and was treated at an outside facility. *Id.* at 6, 8.

After ordering all inmates down over the public address system without results, Officer Vargas launched three "2655 Skat Rounds" in the direction of the incident, but to no avail. *Id.* at 6. At approximately 2:57 p.m., Lieutenant Gonzalez contacted Central Control and requested a "Code 3 Response." Responding staff arrived, all inmates were directed in a "yard down" position, and restrained while staff attempted to identify the inmates involved and secure the area. *Id.*

Approximately 30 minutes later, at 3:30 p.m., Officer Melendez radioed for assistance from the Facility C Dining Hall when four Hispanic inmates followed her onto a roadway, one struck her in the face and another "picked her up and slammed her to the ground." *Id.* The same four inmates also "began battering responding staff" until staff was able to quell the second incident by using a 37 mm wood round, OC spray and an expandable baton. *Id.* Melendez sustained bruises to her back and mid-section as a result of the attack. *Id.* at 8.

/ / /

1    While prison officials were responding to the attack on Officer Melendrez near the

2    Dining Hall, Officer Montano, the Control Booth Officer in Facility C's Housing Unit 5,

3    observed 20-30 Hispanic inmates refusing to return to their cells.  Montano watched an inmate

4    named Rivera  break a broom handle on the second tier adjacent to cell 231, and ordered him

5    to "cease and drop the suspected weapon."  When Rivera failed to comply, Montano discharged

6    two 40 mm rounds and aimed toward Rivera, but instead struck the railing of the second tier.

7    Rivera continued to "disperse the suspected makeshift weapons (broom and mop handles) to

8    Hispanic inmates on the lower tier."  *Id.* at 6.

9    At approximately 3:41 p.m., Montano activated his personal alarm, and responding staff

10   found "approximately 20 to 30 Hispanic inmates ... laying in wait."  *Id.* at 7.  These inmates

11   "began assaulting responding staff" with weapons, fists and feet.  Staff used physical force in

12   response, including expandable batons and OC spray, but "due to the magnitude of the attacks"

13   and the "likelihood of great bodily injury," Officer Montano also "retrieved his [Ruger] mini

14   14 (.233) rifle," chambered a round, and again gave an order to inmates to stop.  *Id.* at 7, 9.

15   When Montano observed an inmate named Zamora "striking an unidentified defenseless officer

16   with a broken broomstick, making stabbing motions while the officer was lying on the floor,"

17   Montano "discharged the weapon at Zamora," who fell to the floor.  *Id.* at 7.  All inmates then

18   "complied with orders to assume a prone position," and staff immediately requested medical

19   assistance.  *Id.*  Inmate Zamora, however, was pronounced dead by outside paramedics at

20   approximately 4:14 p.m.  *Id.*

21   After additional responding staff regained control of the Facility exercise yard and

22   housing units, all Hispanic inmates were placed in restraints and moved to the Facility C gym

23   for security purposes.  *Id.*  All non-involved inmates, described as "Blacks, Whites and Others,"

24   were given clothed body searches and returned to their cells, with the exception of those housed

25   in Facility C, Building 5, which was temporarily declared a "crime scene."  *Id.*

26   With the exception of inmates Zamora and Jacobo, who required immediate emergency

27   medical transport, all inmates "identified as being involved in the incident were given clothed

28   and unclothed body search[es]."  *Id.* at 8.  Thirty-seven inmates were immediately identified as

1   possible "suspects," eleven individual correctional officers were identified as "victims"

2   requiring medical attention, while "numerous other staff received less severe injuries," and

3   twenty-two inmates, excluding Zamora and Jacobo, were decontaminated for O/C spray

4   exposure and treated for various injuries including complaints of swelling, cuts, bruising,

5   abrasions, lacerations, and pain. *Id.* 9-10.  Twenty-seven correctional officers reported having

6   used multiple other instances of force, including O/C spray, expandable batons, 37mm (wood)

7   and "Skat" rounds, 40 mm, an MK-46 and Montano's Ruger mini 14 (.223) rifle to "quell the

8   assault of inmates." *Id.* at 9.

9          As a result of the August 18, 2005 attacks, then Acting Warden Ryan declared a "State

10   of Emergency" at CAL.  *See* Decl. of Robert Borg in Supp. of Defs.' Mot. for Summ. J. (ECF

11   No. 79-5) (hereafter "Borg Decl.") ¶ 5.[2]  Because the State of Emergency declaration modified

12   "all level four programs" for a period set to exceed 24 hours, the State of Emergency was

13   "approved in Sacramento."  Borg. Decl. ¶ 5; *see also* CAL. CODE REGS., tit. 15 § 3383(b)(1).

14   "The purpose of a State of Emergency, lockdown, and modified program at a prison is to safely

15   control inmate movement, restrict potentially volatile inmates or groups, and afford time to

16   evaluate overall operations in order to regain control of the prison population and establish

17   order for the safety of staff, inmates, and visitors."  Borg Decl.  ¶ 5.

18          On the following day, August 19, 2005, Defendant Giurbino was named interim Warden

19   at CAL. *See* Decl. of G. Giurbino in Supp. of Defs.' Mot. for Summ. J. (ECF No. 79-8)

20   (hereafter "Giurbino Decl.") ¶ 3.

21          **B.    Plaintiff's Allegations**

22          In his Amended Complaint, Plaintiff contends that during the lockdown and modified

23   program restrictions imposed, he was "confined to a double bunk cell twenty-four (24) hours

24   a day, seven days a week," from August 2005 through May 2006. FAC at 4, 6, 10.  Plaintiff

25   contends he was permitted outside his cell during that time only to shower, "98% of the time

26

27          [2]  Pursuant to CAL. CODE REGS., tit. 15 § 3383(a), "[a] state of emergency shall exist when the institution head ... temporarily suspends any nonessential operation, procedure, service or function, and the normal time-limits or schedules for such activity, in order to prevent, contain, or control a disturbance."

28

1    in restraints," or for approved medical, dental or mental health care or law library access.  *Id.*

2    at 4.  Plaintiff admits there "was a period in March when [he] was allowed to exercise outdoors

3    once," but that as a result of being deprived of outdoor exercise for nearly nine months, he

4    "suffered headaches, muscle cramps, stress, anxiety and depression." *Id.*

5         Plaintiff further contends the "disturbance" which prompted the lockdown was

6    "contained and controlled by October 10, 2005," and as a result, "the administration ... beg[a]n

7    to ease restrictions."  *Id.* at 6.  For example, Plaintiff claims by November 5, 2005, "interviews

8    had already been conducted," he and other critical workers were permitted to report to their

9    assignments, and canteen and quarterly package privileges were resumed.  *Id.*  However,

10   outdoor exercise continued to be denied Plaintiff and others even though they were "not part

11   of the investigation" and "deemed [members of] a 'non-[a]ffected' race."  *Id.*  Plaintiff

12   concludes that Defendants continued the deprivation of outdoor exercise for a prolonged period

13   "in bad faith" and "not to prevent a disturbance," but instead, "as a means to punish" and

14   "deter[] future staff assaults by subjecting inmates to such extreme suffering that they would

15   not want another period of lockdown."  *Id.* at 6, 7, 10.

16   **C.    Defendants' Responses**

17        As Warden, Defendant Giurbino asserts he "was the person responsible for making

18   decisions" regarding both the lockdown and "the framework for the modified program," which

19   included no outdoor exercise.[3]  *Id.* ¶¶ 5, 6.  In making these decisions, Giurbino alleges to have

20   considered "not only the August 18, 2005 attempted murder of staff, but also the degree of

21   organization that went into the widespread assaults, the violence at CAL which had been

22   / / /

23   / / /

24

---

25   [3]  Giurbino claims that as his subordinates, neither Defendant Janda nor Bourland had "the
     authority to deviate from the restrictions imposed as set forth in [the] program status report [PSR]

26   matrix."  Giurbino Decl. ¶ 12; *see also* Borg Decl. ¶ 12 (citing Cal. Code Regs., tit. 15 § 3383);
     Scribner Decl. ¶ 6 "(They [Bourland and Janda] could not allow outdoor exercise for general population

27   inmates, such as Mr. Hayes, without my authorization.  Under California regulations, the ultimate
     decisions regarding when the modified program would be lifted, and outdoor exercise permitted, were
     reserved for me as the Warden, with approval from the Director or Associate Director at CDCR

28   headquarters in Sacramento.").

ongoing and escalating over the preceding two years,"[4] "day-to-day circumstances," "continuing violence or potential violence," the "intelligence gathered from inmate interviews," and "outside influences which could affect the prison population." *Id.* ¶ 7.

The initial Program Status Report ("PSR") issued to all CAL staff and inmates describes the Plan of Operation ("PO") which went into effect as a result of the State of Emergency declared on August 18, 2005, and outlines the "modified program" immediately ordered for all inmates at CAL Facilities A, B, C, and D, including Plaintiff, who was housed on Facility A. *See* Borg Decl., Ex. C (ECF No. 79-10) at 97; Pl.'s Decl. in Supp. of Opp'n (ECF No. 85) ¶ 2.

The initial August 18, 2005 PSR required 2-man correctional officer escorts and restraints for all inmate movement, unclothed body searches prior to escort, in-cell feeding, and prohibited all visiting, canteen, packages, phone calls, dayroom activity, and recreational activities. Borg Decl., Ex. C at 97. Existing medical, dental and mental health ducats were honored, a medical technical assistant (MTA) was authorized to conduct rounds in-unit, religious services were limited to "in cell," library access was permitted "in restraints," and only "critical" minimum custody inmates were allowed out of cell to report to work assignments. *Id.* This PO remained relatively unchanged from August 19, 2005 through August 26, 2005. *Id.* at 97-102.

Starting shortly after August 19, 2005, staff at CAL "conducted exhaustive searches of all cells and all areas accessible to inmates in Facilities A, B, C, and D." Giurbino Decl. ¶ 9. By September 1, 2005, the searches were "50% complete," and by September 15, 2005, they were concluded. Borg Decl., Ex. B (ECF No. 79-10) at 112; Giurbino Decl. ¶ 9.

By August 26, 2005 "[i]nmates involved in the riot were placed in Administrative Segregation ("Ad-Seg") and their property [was] relocated." Builteman Decl. Ex. C (ECF No.

/ / /

---

[4] "[D]uring the week preceding the August 18, 2005 major assault on staff," "there were eleven serious, violent incidents between August 11, 2005 and August 17, 2005," at "all" CAL facilities except Facility D. *See* Borg Decl. ¶ 4. These included "two staff assaults, a battery on a peace officer, one incident of threatening staff, discovery of a live round of ammunition, two incidents of inmates in possession of weapons, a battery on an inmate, and attempted battery on an inmate, and two mutual combat incidents." *Id.*

79-10) at 112.  Beginning on September 2, 2005, "limited" access to the canteen was made available to general population inmates on Facilities A, B, C, and D.  *Id.* at 121.

On September 6, 2005, an inmate in Facility B became disruptive and was forcibly removed from his cell.  An officer was injured while trying to "gain control of the inmate."  *Id.* at 122.  On September 7, 2005, "some disturbances were reported on A3.  Inmates in 43 cells ha[d] covered their windows as a protest [against] cell searches."  *Id.* at 125.  In addition, officials received an anonymous "kite" which indicated "some inmates [were] exhorting others to resist ... searches on Facility D."  *Id.*  On September 8, 2005, 11 of the 43 Hispanic inmates in A3 who were "covering their doors and refusing to cooperate with facility searches" were forcibly extracted.  *Id.* at 129.  On September 12, 2005, a Facility A inmate threw cleaning solution on an officer, a Facility C inmate made threats to staff, an inmate letter was intercepted "regarding additional staff assaults," and an Ad-Seg inmate was battered by an unknown assailant.  *Id.* at 135, 138.  In Program Meeting Notes dated September 13, 2005, however, the "[m]ain complaint" by inmates on Facility A where Plaintiff was housed was related to in-cell feeding on paper plates.  *Id.* at 139.  Despite these incidents, and the fact that CAL's Investigative Service Unit ("ISU") was "[s]till interviewing and gathering intel" related to the August 15, 2005 riot, on September 13, 2005, Defendant Giurbino's announced his goal was "to remove State of Emergency by ... September 16, 2005."  *Id.* at 140.  On September 15, 2005, family visits were restored "for non-Hispanics housed in Facilities A, B, C, and D."  *Id.* at 146.

On September 16, 2005, Warden Giurbino requested and was granted approval from the CDCR's Director of the Division of Adult Institutions "to conclude the declared State of Emergency" and commence transition to a modified program in Facilities A, B, C, and D, "which would initially exclude outdoor exercise."  Giurbino Decl. ¶ 11.  Giurbino asserts his "goal was to bring institution activities back to normal ... as soon as possible without sacrificing safety or security."  *Id.* ¶ 15.

To this end, beginning on August 26, 2005, and continuing until the first week of January 2006, when he was replaced by Warden Scribner, Defendant Giurbino conducted "lockdown meetings" on an almost daily basis to "review the modified program, and to evaluate

8

1    intelligence gathered as a result of searches and inmate interviews." Giurbino Decl. ¶¶ 13, 26;

2    Scribner Decl. (ECF No. 79-9) ¶ 4.   Defendant Janda, as CAL's Associate Warden, and

3    Defendant Bourland, who served as both CAL's Associate Warden of Housing, and later as

4    acting Chief Deputy Warden, attended Giurbino's (and later Scribner's) lockdown and modified

5    program meetings. *See* Decl. of G. Janda in Supp. of Mot. for Summ. J. (ECF No. 79-7)

6    (hereafter "Janda Decl.") ¶ 3; Decl. of M. Bourland in Supp. of Mot. for Summ. J. (ECF No.

7    79-6) (hereafter "Bourland Decl.") ¶ 3; Decl. of L.E. Scribner in Supp. of Mot. for Summ. J.

8    (ECF No. 79-9) (hereafter "Scribner Decl.") ¶ 9.  However, both Giurbino and Scribner claim

9    that in this capacity, Bourland and Janda "at most ... could make recommendations ... regarding

10   current prison conditions and current intelligence regarding when the modified program would

11   be lifted, and outdoor exercise permitted." However, all "ultimate decisions" were reserved for

12   the Wardens, "with approval" from CDCR headquarters.  Giurbino Decl. ¶ 12; Scribner Decl.

13   ¶ 6.

14          During these meetings, Warden Giurbino received and evaluated some recommendations

15   for "physical plant changes ... from various staff classifications" and undertook projects

16   including the "relocation of tables," window frosting, addition or modification of "security

17   access gates inside the secured perimeter," and the "reattach[ment] [of] all electrical outlets and

18   light fixtures with pop-up rivets to eliminate those areas as hiding places for weapons and other

19   contraband." Giurbino Decl. ¶ 22.

20          Giurbino also continued to receive reports of "ongoing incidents of violence" and threats

21   to the institution, including:  intelligence from Facility A, where Plaintiff was housed on

22   October 26, 2005, that "staff might be assaulted or killed once the institution resumed normal

23   programming," *Id.* ¶ 26; Ex. C (ECF No. 79-10) at 251; found weapons,[5] escape paraphernalia

24   and the discovery of an "escape plot"; a missing screwdriver, and several instances of inmates

25   / / /

26

27          [5] Weapons were specifically discovered in Facility A, where Plaintiff was housed, on November
     9 and/or 10, 2005.  Builteman Decl., Ex. C at 33, 39.  On November 17, 2005, a confidential letter was
28   intercepted in Facility A, *id.* at 60, and an Investigative Lieutenant advised Giurbino that "safety and
     security might be affected by the African-American population." Giurbino Decl. ¶ 26.

09cv1016 BTM (RBB)

1    threatening, assaulting, and battering staff, throughout the months of October, November and

2    December 2005.  Giurbino Decl.  ¶ 26.

3        Nevertheless, "by November 8, 2005, [Giurbino] had taken steps toward normal

4    programming by allowing inmates who ... passed a risk assessment to have unrestrained

5    interaction with staff, easing restrictions on canteen, vendor packages and allowing ...

6    visitation."  *Id.* ¶ 23.   Critical workers were permitted to "return to critical job functions

7    between September and November 2005," medical personnel "walked the cell blocks to identify

8    and address medical needs," inmates who required them were permitted to attend medical,

9    dental and mental health appointments, inmates with legal deadlines were permitted library

10   access, and chaplains and religious volunteers were "allowed to walk the tiers."  *Id.*

11       Giurbino claims because the inmate who was shot and killed on August 18, 2005, "was

12   a known gang member," he was especially "concerned about the potential for further violence

13   and retaliation against staff,"[6] and felt it would have been "unsafe to expose staff to

14   unrestrained general population inmates until those who were planning future assaults" and

15   others designated as a result of the August 18, 2005 incident as "180-design inmates" could be

16   "identified and removed from the general population."  *Id.* ¶¶ 20, 21, 27.[7]  "140 inmates had

17   been transferred by November 14, 2005, and another 140 were endorsed and awaiting transfer.

18   By December 2, 2005, 236 inmates had been transferred, and by December 29, 2005, a total of

19   297 inmates had been transferred."  Borg Decl. ¶ 9.  However, this interview, file-review,

20   administrative hearing and transfer process "was still ongoing when [Giurbino] left Calipatria

21   in early January 2006."  Giurbino Decl . ¶ 20.

22

23

24       [6]  In this regard, Giurbino was also "concerned about violence in connection with the upcoming, and well-publicized execution of Stanley Williams, the founder of the Crips gang," as it approached and was carried out on December 13, 2005.  Giurbino Decl. ¶ 28; Builteman Decl. Ex. C at 146.

25

26       [7]  According to Giurbino, CAL is a "270-design prison, which is not as high-security as a 180-design prison."  Giurbino Decl. ¶ 18.  "[I]nmates who commit serious offenses while in lower-security prisons become classified as 180-design ... inmates."  *Id.*  "Because a number of the inmates involved in the August 18, 2005 assaults were 180-design inmates," and "based on a recent prior institutional review of CAL making this recommendation, all 180-design inmates ... housed at CAL's general population needed to be identified and transferred to 180-design prisons," or transferred to CAL's Ad-Seg Unit.  *Id.* ¶ 19.

27

28

10

1    Because of the "large number of 180-design inmates at [CAL], there was not enough

2    room to place all the high-violence 180-design inmates in [the] Ad-Seg Unit while they awaited

3    transfer."  Giurbino Decl. ¶ 21.  Therefore, many, including Plaintiff, remained in general

4    population, but subject to a modified program schedule, which did not provide for "unrestrained

5    movement within the housing units" or access to outdoor exercise until sometime in March

6    2006.  Scribner Decl. ¶ 13.  Giurbino claims that he "did not believe it was safe for inmates to

7    be released unrestrained among staff" before he left CAL in January and "was not trying to

8    harm [Plaintiff] or other general population inmates."  Giurbino Decl. ¶ 29.  Instead, Giurbino

9    claims exercise remained restricted because of "ongoing interviews and identification of

10   additional inmates involved in the [August 18, 2005] incident itself or in planning future

11   violence," "ongoing identification and transfer of 180-design inmates from the general

12   population," "ongoing violence," "intelligence showing that further attacks were being

13   planned," the "potential for retaliation [against] staff for having shot and killed a gang

14   member," and "the potential for violence associated with the execution of a well-known gang

15   founder."  *Id.*

16   After Giurbino's departure in January 2006, Warden Scribner assumed responsibility for

17   "comprehensively evaluating and establishing appropriate prison programming with the purpose

18   of restoring long-term safety and security."  Scribner Decl. ¶¶ 4-5.  Like Giurbino before him,

19   Scribner "conducted regular meetings to review the modified program," and to "evaluate

20   intelligence," with the "goal [of] bring[ing] institutional activities back to normal programming

21   without sacrificing safety or security."  *Id.* ¶¶ 9, 11.

22   To this end, on February 2, 2006, Warden Scribner held a meeting to "discuss a

23   comprehensive five-phase plan to ... resume normal programs over a five-week period starting

24   on February 6, 2006."  *Id.* ¶ 13.  "Under this plan, inmates in Facilities A, B, and C, including

25   [Plaintiff], were allowed exercise yard on a modified schedule beginning March 13, 2006,"

26   which "allowed each building a half-day of yard one day a week."  *Id.; see also* Builteman Decl.

27   Ex. C (ECF 79-12) at 299-300, 307-317.

28   / / /

1   This plan was "interrupted on March 20, 2006," however, after "a homicide attempt

2   against staff [occurred] in Facility B."  Scribner Decl. ¶ 14.  "Effective March 20, 2006, the

3   entire institution was again placed on modified program." Builteman Decl. Ex. C (ECF No. 79-

4   12) at 10.  Once searches were conducted in all housing units, non-contact visiting was resumed

5   as soon as March 29, 2006, and "normal" visiting was resumed for Plaintiff in Facility A by

6   April 22, 2006.  Scribner Decl. ¶ 15.

7   While he "attempted to return the prison to normal programming," "31 violent incidents"

8   occurred in April 2006, and Scribner concluded "it was too early to return outdoor recreation

9   and dining to normal."  *Id.* at ¶¶ 15, 16.  On May 15, 2006, however, "Black inmates in Facility

10  A, where [Plaintiff] was housed, were again allowed to resume exercise yard on a modified

11  schedule of one half day on the yard one day per week."  *Id.*  Prior to that time, and based on

12  "ongoing interviews and identification of additional inmates involved in the incident itself or

13  planning future violence, the continued violence," and "rumors that further attacks were being

14  planned," Scribner "did not believe it was safe for inmates to be released unrestrained among

15  staff," and "neither [he] nor the administration were trying to harm [Plaintiff] or other general

16  population inmates."  *Id.* ¶ 18.

17  **III.   Defendants' Motion For Summary Judgment**

18      **A.     FED.R.CIV.P. 56 Standard of Review**

19  Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that

20  there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

21  matter of law."  *Nat'l Ass'n of Optometrists & Opticians v. Harris,* __ F.3d __, 2012 WL

22  2126043 at *2 (9th Cir. June 13, 2012) (No. 10-16233) (quoting FED.R.CIV.P. 56(a)); *see also*

23  *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007).

24          Under summary judgment practice, the moving party always bears
            the initial responsibility of informing the district court of the basis
25          for its motion, and identifying those portions of "the pleadings,
            depositions, answers to interrogatories, and admissions on file,
26          together with the affidavits, if any," which it believes demonstrate
            the absence of a genuine issue of material fact.

27

28  / / /

12                                                                  09cv1016 BTM (RBB)

1   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v.*

2   *MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment

3   is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need

4   for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

5   (citations omitted).

6       If the moving party meets its initial responsibility, the burden then shifts to the

7   nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.

8   *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving

9   party is "required to present significant, probative evidence tending to support h[is] allegations,"

10  *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that

11  demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in

12  the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v.*

13  *Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56;

14  *Celotex*, 477 U.S. at 323). "The substantive law determines which facts are material; only

15  disputes over facts that might affect the outcome of the suit under the governing law properly

16  preclude the entry of summary judgment." *Nat'l Ass'n of Optometrists*, __ F.3d at __, 2012 WL

17  2126043 at *2 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The

18  opposing party cannot rest solely on conclusory allegations of fact or law. *Berg v. Kincheloe*,

19  794 F.2d 457, 459 (9th Cir. 1986). Instead, to demonstrate a genuine issue requiring trial, the

20  opposing party "must do more than simply show that there is some metaphysical doubt as to the

21  material facts." *Matsushita*, 475 U.S. at 587 (citation omitted).

22      The evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255.

23  All reasonable inferences that may be drawn from the facts placed before the court must be

24  drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587. Nevertheless,

25  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

26  factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight*

27  *Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

28  / / /

1   Because it is relevant in this case, the Court also notes it "does not have a duty to search

2   for evidence that would create a factual dispute." *Bias*, 508 F.3d at 1219 (citing *Carmen v.*

3   *Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)).  In *Carmen*, the Ninth Circuit found

4   it "unfair" to the require the district court to "examine the entire file for evidence establishing

5   a genuine issue of fact, where the evidence is not set forth in the moving papers with adequate

6   references so that it could be conveniently found." *Id.*; *see also Forsberg v. Pacific N.W. Bell*

7   *Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir. 1988) (district court is "not required to comb the

8   record to find some reason to deny a motion for summary judgment").  This is true even where

9   the non-moving party is proceeding in pro se.  *See Bias*, 508 F.3d at 1219 (affirming summary

10  judgment for defendants where pro se plaintiff "failed to present any evidence in opposition"

11  and expressly rejecting pro se litigant's argument that the district court "should have searched

12  the entire record to discover whether there was any evidence [to] support[] her claims" because

13  she was proceeding without counsel).  "A district court lacks the power to act as a party's

14  lawyer, even for pro se litigants." *Bias*, 508 F.3d at 1219.

15      **B.    Defendants' Arguments**

16      Defendants seek summary judgment on the following grounds:  (1) no genuine issues

17  of material fact exist to show Plaintiff's Eighth Amendment rights were violated, *see* Defs.'

18  Mem. of P&As in Supp. of Mot. for Summ. J. (ECF No. 79-1) at 25-32; (2) neither Defendant

19  Bourland nor Janda may be held liable because no evidence in the record shows either of them

20  had the authority to override the Warden's modified program following the initial State of

21  Emergency and independently provide Plaintiff with outdoor exercise opportunities, *id.* at 32-

22  34; and (3) they are all entitled to qualified immunity.  *Id.* at 34-38.

23      Plaintiff opposes, arguing Defendants violated his Eighth Amendment rights by

24  "depriv[ing] him of outdoor exercise opportunities for a 10-month period in bad faith and as

25  a means to punish."  Pl.'s P&A's in Supp. of Opp'n (ECF No. 84) (hereafter "Pl.'s Opp'n") at

26  1.  In support, Plaintiff points to the evidence in the record which shows that Defendants began

27  to "ease" lockdown restrictions as early as August 26, 2005, including those related to critical

28  workers, escort ratios, canteen, visitation, in-cell feeding, package, phone calls, and shower

1    privileges, but did *not* begin to ease any restrictions on outdoor recreation until March 2006,

2    even though Defendants themselves noted at various lockdown meetings that "the institution's

3    facilities were 'relatively quiet' and there were 'no major incidents to report.'" *Id.* at 2-11.

4    Plaintiff contends summary judgment is inappropriate because it is permissible to infer

5    Defendants' failure "to consider a means to provide ... outdoor exercise" as part of their

6    "disturbance control plan," before March 2006 is evidence of their deliberate indifference and

7    an "intent to punish" Plaintiff and others because it came "on the heels of so many [of their] co-

8    workers being injured" during the August 18, 2005 attacks. *Id.* at 13-15.

9       **C.    Eighth Amendment Deprivation of Exercise**

10          Prison officials may violate the Eight Amendment's prohibition on cruel and unusual

11   punishments if they deprive the inmate of "a single, identifiable human need such as food,

12   warmth or *exercise.*" *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (emphasis added); *Thomas v.

13   Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010) ("[E]xercise if one of the most basic human

14   necessities protected by the Eighth Amendment.").

15          To prove an Eighth Amendment violation, however, the prisoner must  "objectively

16   show that he was deprived of something 'sufficiently serious,'" and "make a subjective showing

17   that the deprivation occurred with deliberate indifference to [his] health or safety." *Foster v.

18   Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834

19   (1994)).

20          "[O]rdinarily the lack of outside exercise for extended periods is a sufficiently serious

21   deprivation" for Eighth Amendment purposes. *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir.

22   1993).  A prohibition on outdoor exercise of six weeks is a "sufficiently serious" deprivation

23   to support an Eighth Amendment claim. *See, e.g., Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th

24   Cir. 2000) (en banc); *Allen v. Sakai*, 48 F.3d 1082, 1086 (1994).

25          If the prisoner can show his deprivation was objectively sufficiently serious, he must

26   next "make a subjective showing that the deprivation occurred with deliberate indifference to

27   [his] health or safety." *Foster*, 554 F.3d at 812 (quoting *Farmer*, 511 U.S. at 834).  Deliberate

28   indifference involves a two part inquiry.  First, the prisoner must show that prison officials were

15                                    *09cv1016 BTM (RBB)*

1  aware of a "substantial risk of serious harm." *Thomas*, 611 F.3d at 1150 (quoting *Farmer*, 511

2  U.S. at 837).  This part of the inquiry may be satisfied if the prisoner "shows that the risk posed

3  by the deprivation is obvious." *Id.*  Second, the prisoner must "show that the prison officials had

4  no 'reasonable' justification for the deprivation, in spite of that risk." *Id.* (quoting *Farmer,* 511

5  U.S. at 844).

6          Thus, the Ninth Circuit has specifically identified these types of conditions claims as

7  "context-sensitive," *Richardson v. Runnels*, 594 F.3d 666, 673 (9th Cir. 2010), for they require

8  consideration of the "individual facts of each case," *id.*, including the length and severity of the

9  deprivation, the circumstances giving rise to it, and the deference owed to prison officials

10  charged with both a "duty to keep inmates safe" and the need to establish order and security,

11  which must be "balance[d] ... against other obligations that our laws impose."  *See Norwood*

12  *v. Vance*, 591 F.3d 1062, 1068-1070 (9th Cir. 2010), *cert. denied*, 131 S. Ct 1465 (U.S. Feb. 22,

13  2011) (No. 09-1215) (hereafter "*Norwood*").  In short, because "a prisoner's right to outdoor

14  exercise is [not] absolute and indefeasible, [nor does] it trump all other considerations," *id.* at

15  1068, it usually "require[s] a full consideration of context, and thus, a fully developed record."

16  *Richardson*, 594 F.3d at 672 (citing *Norwood*, 591 F.3d 1062).

17                    **1.    Defendants Bourland and Janda**

18          Defendants Bourland and Janda first seek summary judgment on grounds arguing that

19  neither of them may be held liable for any violation of Plaintiff's Eighth Amendment rights

20  because no evidence in the record shows they had the authority to override the Warden's

21  modified program following the initial State of Emergency and independently provide Plaintiff

22  with outdoor exercise opportunities.  *See* Defs.' P&As in Supp. of Summ. J. (ECF No. 79-1)

23  at 32-34.

24          Plaintiff contends Bourland and Janda "clearly influence[d] the determination to deprive

25  [him] of outdoor exercise," because Defendants' own exhibits show they "had the ability to

26  approve [PSRs]," attended lockdown meetings, and made "recommendations" to Wardens

27  Giurbino and Scribner that "would" or could have provided outdoor exercise.  *See* Pl.'s P&As

28  in Supp. of Opp'n (ECF No. 84) at 14-15.  Defendants do not deny Bourland and Janda made

1   recommendations; however, they claim all *ultimate* decisions to impose, modify or lift any

2   programming restriction are nevertheless reserved "under California regulations," to the

3   Warden "with approval from the Director or Associate Director at CDCR Headquarters in

4   Sacramento."  Giurbino Decl. ¶ 6; Scribner Decl. ¶ 6; Bourland Decl. ¶¶ 3-5; Janda Decl. ¶¶ 3-

5   5.

6        Defendants do not cite which regulations so specify, however; and CAL. CODE REGS.,

7   tit. 15 § 3383, which is cited by Plaintiff and governs "State[s] of Emergency" is ambiguous as

8   to ultimate decision-making authority once a declared "State of Emergency" has been officially

9   "concluded" as Defendant Giurbino claims occurred in this case on September 16, 2005, but

10   the institution remains in an "institution wide Modified Program" while it transitions back to

11   a "normal" one.  *See* Giurbino Decl. ¶¶ 11, 12; Builteman Decl. Ex. C at 152; 15 CAL. CODE

12   REGS., tit. 15 § 3383(d) (providing that "[d]uring a state of emergency, the cause and effect

13   shall be constantly reviewed and evaluated by the institution head ..., through appropriate

14   staff.").[8]

15        Regardless of who had the ultimate authority to impose, modify, or lift the restrictions

16   on Plaintiff's exercise from August 2005 through May 2006, Plaintiff claims, and the

17   voluminous daily progress report meeting notes kept during this period of time reveal, that both

18   Defendants Bourland and Janda, in their capacities as Associate and Chief Deputy Wardens,

19   had the power to collect information and intelligence, discuss conditions affecting security,

20   consider a myriad of circumstances affecting security in all CAL Facilities, attend lockdown

21   meetings, and the authority to make recommendations to the Wardens as to whether and when

22   all sorts of restrictions, including exercise on Facility A, might be eased.  *See* Bourland Decl.

23   ¶ 3; Janda Decl. ¶ 3.

24   _____

25   [8] Title 15 refers only to times "[d]uring a state of emergency" and "[u]pon termination of a state
     of emergency," when "the normal schedules and time frames for administrative decisions and actions
26   pertaining to affected inmates will resume."  15 CAL. CODE REGS., tit. 15 § 3383(d).  It appears that
     "modified programs" which *continue* lockdown restrictions after a "disturbance" has been "contain[ed]"
27   or "controlled" may still be governed by § 3383, but nothing in the plain language of this regulation
     clearly disempowers other "appropriate staff" who are explicitly charged with "constantly review[ing]
28   and evaluat[ing]" the "cause and effect" of the state of emergency and reporting to the "institution
     head," from making recommendations regarding the restoration of privileges as circumstances warrant.

1    In fact, while many of the PSRs and Lockdown/Modified Program Meeting Memoranda

2 in the record dating from October 17, 2005 through May 16, 2006 are signed as "approved" by

3 Wardens Giurbino and Scribner, many dozens *more* are "prepared by" as well as "approved"

4 by M. Bourland, Chief Deputy Warden.  *See* Builteman Decl. Ex. C (ECF No. 79-10) at 228-

5 235; 255-262; (ECF No. 79-11) at 7-16; 21-37; 42-58; 63-69; 73-74; 79-80; 84-85; 89-95; 101-

6 102; 106-107; 112-113; 117-128; 133-134; 139-140; 144-145; 159-165; 169-199; 204-205;

7 210-211; 216-217; 22-223; 228-233; 237-240; 244-260; 263-298; 301-302; 304-305; (ECF No.

8 79-12) 7, 10-13; 18; 22-25; 27-31; 43-44.   Evidence in the record further shows that as

9 Associate Warden of Housing and later as Chief Deputy Warden, Defendant Janda also

10 reviewed, submitted and approved a PSR and "Proposed Unlock Action Plans" on February 2,

11 2006 and February 17, 2006.  *Id.* (ECF No. 79-11) at 299-300; 310-312.

12    Thus, under these circumstances, the Court finds genuine issues of material facts exist

13 as to whether Defendants Bourland and Janda may be held liable for personally causing a

14 violation of Plaintiff's Eighth Amendment rights by failing to suggest or consider the re-

15 introduction of outdoor exercise for general population prisoners, like Plaintiff, who were not

16 implicated in the August 18, 2005, riot and who were already cleared for other eased

17 restrictions, prior to March 2006.  *See Anderson*, 477 U.S. at 249; *see also Leer v. Murphy*, 844

18 F.2d 628, 633 (9th Cir. 1988) ("The inquiry into causation must be individualized and focus on

19 the duties and responsibilities of each individual defendant whose acts *or omissions* are alleged

20 to have caused a constitutional deprivation.") (emphasis added); *see also Farmer*, 511 U.S. at

21 841 (Eighth Amendment's deliberate indifference requirements may be satisfied if prison

22 officials "acted *or failed to act* despite ... knowledge of a substantial risk of serious harm.")

23 (emphasis added).

24    **2.    Objective Component**

25    Defendants next argue that Plaintiff "has failed to satisfy the objective component of an

26 Eighth Amendment claim for denial of outdoor exercise," because "he was not locked in his

27 prison cell seven days a week, 24 hours a day, as alleged in his First Amended Complaint."

28 Defs.' P &As in Supp. of Summ. J. (ECF No. 79-1) at 27.  Defendants claim that because

1   Plaintiff admitted during his deposition to have served as an inmate clerk in the program office

2   for approximately 30 hours per week, he was permitted "out of [his] cell regularly for [his] job

3   assignment" sometime after the state of emergency was lifted in September 2005," and was

4   "given a half day of yard one day per week beginning March 13, 2006," his deprivation was not

5   "sufficiently serious" to warrant Eighth Amendment protection. *Id.*; *see also* Decl. of Stephen

6   Aronis in Supp. of Summ. J. (ECF No. 79-4), Ex. B at 16-18.

7        Plaintiff contends that even if he "could have been escorted to medical" or the library,

8   or could "walk to and from the shower" or to his job as a "critical worker" in the program

9   office, from August 19, 2005 through March 13, 2006, he was nevertheless denied a "sufficient

10  source" of exercise for more than 7 months, and that as a result, he suffered "headaches, muscle

11  cramps, leg cramps," "stress" and depression, for which he required medication.  Pl.'s Opp'n

12  at 16.

13       There is no "bright-line" rule setting forth the amount of time or circumstances under

14  which prisoners may be denied out-of-cell exercise before the deprivation is considered

15  "sufficiently serious" to invoke Eighth Amendment protection.  However, the Ninth Circuit has

16  consistently held the "long-term" denial of outdoor exercise may violate the Eighth

17  Amendment.  *See Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (en banc) (holding

18  6 ½ week denial sufficient to satisfy the objective component of an Eighth Amendment

19  violation); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318

20  (finding triable issues of fact regarding 6-month deprivation of outdoor exercise); *Thomas v.*

21  *Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) (finding "undisputed fact" that prisoner was

22  denied outdoor exercise for 13 months and 25 days sufficient to show a "substantial

23  deprivation" sufficient to survive summary judgment).

24       Based on these precedents and the record before it, this Court finds Defendants have

25  failed to show that the prohibition on Plaintiff's access to outdoor exercise from August 19,

26  2005 through March 13, 2006, and again from March 20, 2006 through May 15, 2006, was not

27  "sufficiently serious" as a matter of law.  *Lopez*, 203 F.3d at 1132-33; Scribner Decl. ¶¶ 13-15.

28  Because triable issues of material fact exist as to the objective component of Plaintiff's Eighth

19

1   Amendment claims, summary judgment is not warranted on this basis.  *Celotex*, 477 U.S. at

2   323; *Keenan*, 83 F.3d at 1089.

3       **3.**        **Subjective Component**

4           However, Defendants further argue "even if a genuine issue of material fact exists

5   regarding the objective component of [Plaintiff's] Eighth Amendment claim," there is "no

6   genuine issue of material fact to support the subjective component," because the evidence

7   "overwhelming demonstrates that the restrictions on outdoor exercise were instituted for the

8   primary purpose of responding to, investigating, and preventing further potentially deadly

9   violence at CAL." Defs.' Mem. of P&A's in Supp. of Summ. J. (ECF No. 79-1) at 30.

10  Defendants point to the almost daily lockdown meeting minutes lodged in support of their

11  Motion to show that "from August 18, 2005 onward," in the aftermath of an "organized,

12  coordinated effort by numerous inmates to murder staff," Defendants "made a good faith effort

13  to restore order and security to the prison," and "gradually restored various aspects of normal

14  programming as it was safe to do so." *Id.*  In support, Defendants also offer the testimony of

15  Robert Borg, a former CDCR official with fifty-one years of experience in corrections, who

16  reviewed the record of the lockdown at issue in this case.  Decl. of Robert Borg in Supp. of

17  Summ. J. (ECF No. 75-5) (hereafter "Borg Decl.").  According to Borg, "[t]he level of violence

18  prevalent at CAL between August 2005 and May 2006 did ... require that a considerable period

19  of time be spent to make sure the prison was safe before normal programming was resumed."

20  Borg Decl. ¶ 5.  "Activities such as open yard (where outdoor exercise is available) and meals

21  in the dining rooms create the most obvious and severe threat to safety and will be the last

22  activities restored to normalcy.  That is because these activities allow large numbers of

23  unrestrained inmates to be in close proximity to each other and staff, in numbers that far

24  outnumber staff, and give inmates greater access to items that could be used as weapons." *Id.*

25  ¶ 6.[9]

26  / / /

27

28        [9] In *Norwood*, the Ninth Circuit noted that "[a]ttacks on staff," like those which prompted the lockdown in this case, "are, by their nature, more serious challenges to prison authority than attacks on other inmates."  591 F.3d at 1070.

                                                                  

For his part, Plaintiff claims that Defendants "know outdoor exercise is a constitutional requirement," but that they exhibited deliberate indifference to his rights by failing to "make outdoor exercise a part of the disturbance control plan" before March 2006.  Pl.'s Opp'n (ECF No. 84) at 10-11, 13.  Plaintiff contends that because Defendants considered and were able to successfully ease other types of lockdown restrictions, but did not do the same regarding outdoor exercise for more than 7 months after the August 18, 2005 incident even though their program notes show there were "no major incidents" and the facilities were "relatively quiet," it is permissible to infer they refused to lift exercise restrictions "as a means to punish" "those inmates directly involved " and as a "means to deter those uninvolved" because the deprivation followed "on the heels of so many [of their] co-workers being injured."  *Id.* at 11, 14-15.  Plaintiff then points to a rules violation report he was issued sometime in May 2006, for which he was assessed "10 days loss of yard," as proof that prison officials "see outdoor exercise as a privilege and use it to punish inmates."  *See* Pl.'s Decl. in Supp. of Opp'n (ECF No. 85) ¶ 24 at 3 & Pl.'s Ex. M at 62-63.

Defendants reply that Plaintiff is "comparing apples to oranges" and accuse him of "cherry picking documents" related to both the August 18, 2005 through May 2006 lockdown and other unrelated modified programs "to distort and misrepresent" the seriousness of the security issues which prompted the August 18th lockdown and which continued throughout their efforts afterward to restore CAL to a normal program.  Defs.' Reply (ECF No. 90) at 2-5.

Prison officials may be found to have acted with "deliberate indifference" only if they "know[] that inmates face a substantial risk of serious harm and disregard[] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 825.  In the context of an outdoor exercise claim, specifically, the Ninth Circuit has noted that the prisoner's rights are not "absolute" or "indefeasible" and do not "trump all other considerations." *Norwood*, 591 F.3d at 1068.  Deference must be paid to prison officials who "have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost," as this is "for the benefit of the prisoners as much as for the benefit of the prison officials," who have a "duty to / / /

1   keep inmates safe." *Id.* (citing *Hoptowit v. Ray*, 652 F.2d 1237, 1259 (9th Cir. 1982); *Farmer*,

2   511 U.S. at 832-33.

3       Accordingly, when deciding whether prison officials have acted with deliberate

4   indifference in denying outdoor exercise,  courts show "wide-ranging deference" to "prison

5   officials' *judgment* so long as that judgment does not manifest either deliberate indifference or

6   an intent to inflict harm." *Noble v. Adams*, 646 F.3d 1138, 1143 (9th Cir. 2011).  This inquiry

7   has traditionally looked to whether Defendants' justify their actions based on "vague" or

8   "inconsequential logistical concerns" that "might be no more than a matter of convenience," or

9   whether evidence exists to show the denial of exercise "was meant to be punitive" or was

10  "implemented in bad faith." *Norwood*, 591 F.3d. at 1068-69; *Allen*, 48 F.3d at 1088.

11      In support of their Motion, Defendants have submitted reams of prison records related

12  to the August 18, 2005 riot, and virtually day-by-day lockdown meeting minutes which

13  corroborate their initial decision to impose a state-of-emergency after numerous inmates carried

14  out a concerted and organized attack against them, their attempts to quell it, and thereafter

15  investigate its causes; their efforts to identify, discipline and transfer the riot's instigators and

16  other inmates found unsuitable for CAL's 270-design and instead requiring 180-design

17  placement, confiscate contraband and weapons, conduct inmate interviews, repair damage to

18  the facilities, and renovate those areas which suggested vulnerability, all while monitoring and

19  attempting to prevent or at least limit continued instances of violence.  *See* Giurbino Decl. ¶¶ 7,

20  17-29; Scribner Decl. ¶¶ 7-17; Borg Decl. ¶¶ 7-10; 15-19; Builteman Decl., Exs, A-C.

21      The evidence further shows that even *despite* the lockdown and exercise restrictions

22  imposed from August 18, 2005 through May 2006 (with the exception of temporarily restored

23  yard privileges from March 13-20, 2006), "there were two incidents of attempted murder on a

24  peace officer, twenty incidents of battery on a peace officer/staff, fourteen incidents of threats

25  toward peace officers/staff, three instances of attempted battery on a peace officer," and "ten

26  incidents of resisting an officer, requiring the use of force."   Borg Decl. ¶ 18 & Ex. A. In

27  addition, CAL officials found forty-six instances of inmates "in possession of weapons or metal

28  stock," and various instances of inmate-on-inmate violence, including one attempt to murder,

1  two threats to kill or assault, sixty-four incidents of battery of an inmate, battery with a weapon,

2  mutual combat and mutual combat requiring the use of force.  *Id.*  In the face of this

3  overwhelming evidence, and when considered in the context of the fully developed record,

4  *Richardson*, 594 F.3d at 672, the Court easily finds no support for Plaintiff's claims that

5  exercise should have been restored sooner because individual facilities were "relatively quiet"

6  on certain days.  Pl.'s Opp'n at 11.

7       The Court further finds no *evidentiary* support in the record to show that Defendants'

8  decisions to lift some restrictions but not others was the result of any "bad faith" or intent to

9  "punish" him for the August 18, 2005 attacks. Pl's Opp'n at 13;  *Norwood*, 591 F.3d. at 1068-

10 69; *Allen*, 48 F.3d at 1088.  The Court similarly rejects Plaintiff's claims that "Defendants knew

11 information they received (presumably related to threats of ongoing violence in the facility)

12 from inmate sources were false," and that other unspecified "reports by their officers were false

13 and/or exaggerated."  Pl.'s Decl. in Supp. of Opp'n (ECF No. 85) at 1-2, ¶¶ 5-6.  While

14 reasonable inferences must be drawn in his favor, it is Plaintiff's obligation to produce a factual

15 predicate and point to actual evidence in the record from which these inferences may be drawn.

16 *Richards*, 602 F. Supp. at 1244-45.  Without more, and in light of a record which is replete with

17 evidence to show the contrary, Plaintiff's speculations of bad faith are not by themselves

18 sufficient to create a genuine issue of material fact to support a showing of deliberate

19 indifference. *Norwood*, 591 F.3d. at 1068-69; *Allen*, 48 F.3d at 1088; *Farmer*, 511 U.S. at 837.

20      In conclusion, in light of the record before it and affording the deference which is due

21 to Defendants' judgments under the circumstances, *Noble*, 646 F.3d at 1143, this Court, like the

22 Ninth Circuit in *Norwood*, "decline[s] [Plaintiff's] invitation to micro-manage officials whose

23 expertise in prison administration," especially in regard to the safety and security, "far exceeds

24 [its] own," 591 F.3d at 1070, and finds no reasonable trier of fact could conclude that

25 Defendants acted with deliberate indifference to Plaintiff's Eighth Amendment rights.

26      Accordingly, Defendants' Motion for Summary Judgment is GRANTED pursuant to

27 FED.R.CIV.P. 56(c).

28 / / /

1

**D.     Qualified Immunity**

2      Finally, Defendants argue even if genuine issues of material fact exist to show Plaintiff's

3  Eighth Amendment rights were violated, they are nevertheless entitled to qualified immunity.

4  Defs.' P&A's in Supp. of Summ. J. (ECF No. 79-1) at 34-38.  Plaintiff claims Defendants

5  "know outdoor exercise is a constitutional requirement," and that their conduct was "unlawful."

6  Pl.'s Opp'n at 18.

7      "Qualified immunity shields government officials from civil damages liability unless the

8  official violated a statutory or constitutional right that was clearly established at the time of the

9  challenged conduct."  *Reichle v. Howards*, __ U.S. __, 132 S.Ct. 2088, 2093 (U.S. 2012) (No.

10  11-262) (citing *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S.Ct. 2074, 2080 (2011)).  Traditionally,

11  "[t]he qualified immunity analysis breaks down into a two-part inquiry."  *Foster v. Runnels*, 554

12  F.3d 807, 812 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).  First, the

13  Court determines if the facts as alleged state a violation of a constitutional right.  *Id.*  "If the

14  allegations establish that a constitutional right has been violated, the next question is whether

15  the right was 'clearly established.'"  *Id.*

16      To be clearly established, a right must be sufficiently clear "that every 'reasonable

17  official would [have understood] that what he is doing violates that right.'"  *al-Kidd*, 131 S.Ct.

18  at 2078 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In other words, "existing

19  precedent must have placed the statutory or constitutional question beyond debate."  *Id.* at 2083.

20  The "clearly established" standard protects the balance between vindication of constitutional

21  rights and government officials' effective performance of their duties by ensuring that officials

22  can "'reasonably ... anticipate when their conduct may give rise to liability for damages.'"

23  *Anderson*, 483 U.S. at 639 (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

24      A district court is "permitted to exercise [its] sound discretion in deciding which of the

25  two prongs of the qualified immunity analysis should be addressed first in light of the

26  circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

27  "[A]lthough the first *Saucier* prong calls for a factual inquiry, ... the second prong of the

28  *Saucier* analysis is 'solely a question of law for the judge.'"  *Dunn v. Castro*, 621 F.3d 1196,

1   1199 (9th Cir. 2010) (quoting *Tortu v. Las Vegas Metro. Police Dep't.* 556 F.3d 1075, 1085

2   (9th Cir. 2009)).

3        In *Noble,* the Ninth Circuit was confronted with Eighth Amendment claims almost

4   identical to those at issue here.  646 F.3d at 1138.  There, an inmate at the Substance Abuse

5   Treatment Facility in Corcoran claimed prison officials violated his Eighth Amendment right

6   to outdoor exercise as a result of a 7-month post-riot lockdown. *Id.* at 1139.  The riot, started

7   by a Crips gang member on January 9, 2002, "included an attempt by prisoners to kill one of

8   the corrections officers and resulted in injuries to 21 staff." *Id.* at 1140.  The assault was

9   considered "unusual" because "normally antagonistic gangs act[ed] together," and it "occurred

10  one day after a previous prison-wide lockdown had been lifted." *Id.*  Like the record shows in

11  this case, Defendants "gradually and in measured stages began to resume normalcy," by slowly

12  providing inmates with visitation and modified day-room privileges, but inmates were not

13  provided access to outdoor exercise until August 1, 2002.  *Id.* at 1141, 46.  "Because the

14  inmates had directed their attacks against staff, increased tension between inmates and staff was

15  a serious concern to those responsible for the safety and security of the prison." *Id.* at 1140.

16  Following a detailed review of the record, the Ninth Circuit concluded that:

17              ... it was not clearly established in 2002— *nor is it established yet*
                —precisely how, according to the Constitution, or when a prison
18              facility housing problem inmates must return to normal operations,
                including outside exercise, during and after a state of emergency
19              called in response to a major riot, here one in which inmates
                attempted to murder staff.
20

21  *Id.* at 1143 (emphasis added); see also *Norwood*, 591 F.3d at 1070 (rejecting claims that prison

22  officials had no need to continue exercise restrictions after initial investigation of assaults were

23  completed and finding defendants entitled to qualified immunity).

24        Thus, in light of the undisputed evidence which provides the reasons for Defendants'

25  August 18, 2005 lockdown and subsequent modified programs, the investigatory steps

26  undertaken in responding to the events, Defendants' attempts to ease restricted programs in

27  stages depending upon the results of their investigations, and repeated ongoing instances of

28  violence despite the lockdown, this Court finds it would not have been clear to a reasonable

1  officer in Defendants' positions that restricting Plaintiff's outdoor exercise from August 18,

2  2005 through May 2006 was unlawful. *Noble*, 646 F.3d at 1143, 1148. As in *Noble*, the record

3  before this Court "demonstrates that officials were continuously, prudently, and successfully

4  looking out for the safety, security, and welfare of *all* involved, staff and prisoners alike. This

5  scenario is precisely what the doctrine of qualified immunity is designed to cover." *Id.* at 1148.

6       Accordingly, Defendants' Motion for Summary Judgment is also GRANTED on the

7  alternative basis of qualified immunity.

8  **IV.   Conclusion and Order**

9       For all the reasons set forth above, the Court hereby GRANTS Defendants' Motion for

10  Summary Judgment pursuant to FED.R.CIV.P. 56(c) (ECF No. 79).

11       The Clerk shall enter judgment for Defendants and shall close the file.

12  **IT IS SO ORDERED**.

13

14  DATED:  November 26, 2012

15

16  BARRY TED MOSKOWITZ, Chief Judge
United States District Court

17

18

19

20

21

22

23

24

25

26

27

28

09ev1016 BTM (RBB)